# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Dalonno C. Johnson,

Plaintiff,

v.

Soo Line Railroad Company, d/b/a
Canadian Pacific Railroad,

Defendant.

Case No. 17-cv-7828

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Dalonno Johnson claims that his former employer, Defendant Soo Line Railroad Company d/b/a Canadian Pacific Railroad, violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by terminating him due to his race, subjecting his to harassment based on race, and retaliating against him for complaining about racism in the workplace. Defendant has moved for summary judgment on all of Plaintiff's claims. [249]. For the reasons explained below, this Court grants in part and denies in part Defendant's motion.

## I. Background[1]

### A. Plaintiff's Employment

Defendant provides freight rail transportation services in Midwest states including Illinois, Minnesota, North Dakota, and Wisconsin. [251] ¶ 1. Defendant's

---

[1] This Court takes these facts from Defendant's Statement of Facts [251], Plaintiff's Response to Defendant's Statement of Facts [281], Plaintiff's Statement of Additional Facts [282], Defendant's Response to Plaintiff's Statement of Additional Facts [293], and various exhibits and declarations the

non-management employees belong to various labor unions, and collective bargaining agreements govern their terms and conditions of employment. *Id.*

Plaintiff Dalonno Johnson's race is black. [282] ¶ 1. Plaintiff started working for Defendant in August 2011; following an initial training period, he began working as a union conductor. [251] ¶ 1. Plaintiff worked in South Dakota until February 2012, and then he worked in Chicago until October 2012 when Defendant furloughed him. *Id.* ¶ 3. The parties agree that Plaintiff's employment required him to know, understand, and follow the General Code of Operating Rules (GCOR). *Id.* The GCOR is a set of operating rules governing railroads in the United States which Defendant has adopted. [282] ¶ 37. The GCOR divides into seventeen categories; GCOR 1 governs general responsibilities. *Id.*

A collective bargaining agreement between Defendant and the United Transportation Union (UTU) governed the terms and conditions of Plaintiff's conductor position. [251] ¶ 4. The UTU CBA included provisions relating to wages, overtime, vacation, seniority, and furloughs. *Id.* Relevant here, Article 12-1 of the UTU CBA, titled "Reduction in Forces" provides:

> When forces are reduced, employees will be laid off in the reverse order of seniority and will be notified in writing that they have been furloughed, copy of such notice to be furnished to the local Union representative.

---

parties have submitted in connection with Defendant's motion for summary judgment. The Court also considered Plaintiff's response to Defendant's objections contained in its reply in support of its motion for summary judgment. [296-1].

*Id.* ¶ 5; [251-1] at 12.

### B.      Plaintiff's Furlough

In October 2012, Defendant furloughed Plaintiff and other conductors. [282] ¶ 2. Instead of remaining on furlough status, Plaintiff voluntarily accepted an assistant signalman position in Defendant's Signals & Communications Department. *Id.* ¶ 3; [293] ¶ 3. This opportunity arose after Defendant and UTU's General Chairman Jim Nelson entered into a side letter agreement, dated January 30, 2013, which allowed furloughed conductors to accept a position within the Brotherhood of Road Signalman (BRS) Union while still retaining their seniority rights as a conductor. [251] ¶ 7. Plaintiff began working as an assistant signalman position on April 8, 2013 under the side letter agreement. *Id.* ¶ 8. A collective bargaining agreement between Defendant and BRS dated January 1, 1986 (BRS CBA) governed the terms and conditions of Plaintiff's employment as an assistant signalman. *Id.* ¶ 9. Under the BRS CBA, an employee does not begin to accumulate seniority until ninety days of continuous service. *Id.* ¶ 10.

The BRS CBA governs, among other things, rates of pay and working conditions. *Id.* One of those conditions, set forth in Rule 27(e), states:

> The seniority and employment of an employee who is absent from duty, without proper authority *may* be terminated, provided such employee is so notified in writing at his last known address by Registered or Certified mail, Return Receipt Requested, with copy to the General Chairman, advising that his seniority and employment have been terminated due to his absence without proper authority and that he may, within 20 days of the date of such notice, if he so desires, request an investigation which will be held under the provisions of Rule 32.

*Id.* ¶ 11; [252-3] at 11 (emphasis added). Rule 27(i) of the BRS CBA provides:

> When the requirements of the service will permit, an Employee, on request, will be granted a layoff or a leave of absence, as provided for below. As absence of less than seven (7) days will be considered a layoff. Except in cases of illness, an employee who desires to layoff will get permission from his immediate superior. If he desires to be absent more than seven (7) days it will be considered a leave of absence and he must make an application in writing. Any request for an extension of leave of absence must be in writing. If the leave or extension is granted it will be in writing. If an employee is unable to protect his assignment due to illness, he must notify his supervisor as soon as possible.

[251] ¶ 12; [252-3] at 12.

The BRS CBA affords covered employees the opportunity to appeal any determination made pursuant to a formal hearing up to the highest designated officer on the property. [251] ¶ 15. It also permits an employee dissatisfied with the outcome of his or her appeal the right to further appeal the decision to the National Railroad Adjustment Board (NLRB) under the Railway Labor Act. *Id.*

## C. Plaintiff's Work as a Signalman and Dismissal

Plaintiff worked continuously as an assistant signalman from about April 2013 to December 2013 but for a leave of approximately 1.5 months sometime during that time frame. [251] ¶ 22; [281] ¶ 22. Defendant first assigned Plaintiff to a post in Minnesota and then another in North Dakota; the North Dakota assignment required Plaintiff to travel by car seven hundred miles from his home in Chicago. [282] ¶ 3. According to Plaintiff, he made this trip every week while assigned to the North Dakota post. *Id.* Plaintiff worked in North Dakota until November 25, 2013, when Defendant assigned him to work in Tomah, Wisconsin. [251] ¶ 23.

4

On November 25, 2013, Defendant assigned Plaintiff to report to duty at Tomah, Wisconsin to Campbell. *Id.* ¶ 26. Plaintiff reported to a different crew foreman and a different manager once assigned to work in Wisconsin than he had in North Dakota. *Id.* ¶ 24. Dan Campbell served as Plaintiff's foreman. *Id.* Plaintiff did not meet Campbell until January 14, 2014. *Id.*

On the evening of November 24, 2013, Plaintiff confirmed with Campbell that he would report for duty the next day. *Id.* ¶ 27. The next day, however, Plaintiff did not report for duty and did not contact Campbell until 5:53 p.m that evening, after his scheduled start time. *Id.* According to Defendant, Plaintiff did not report for duty on November 26, November 27, or December 2; he also did not attempt to contact Campbell or any other superior between his 5:53 p.m. call on November 25 until, on the evening of December 1, Plaintiff left a voicemail for Campbell. *Id.* ¶ 28. In the voicemail, according to Defendant, Plaintiff advised Campbell that he would not report for work on December 2 but that he would be showing up for work on December 3. *Id.*

For his part, Plaintiff does not dispute that he did not report for work on the above dates. Plaintiff asserts that he could not report for duty on November 25 because of car troubles that rendered him unable to drive the two hundred eighty miles to Tomah, Wisconsin. [282] ¶ 10. Plaintiff also maintains that when he called Campbell on November 25, Campbell did not express any concern to Plaintiff about the fact that Plaintiff had not called in before the shift and told him to "get there when he finished" getting repair work done on his car. *Id.* ¶ 11. Plaintiff believed,

based upon Campbell's response, that Campbell expected him to come into work once the repairs to his car were completed. *Id.* Thus, according to Plaintiff, he decided it best to wait until his car was repaired to further communicate with Campbell and spent the first few days of the week (November 26, 27, and December 2) arranging for the repairs for his car. *Id.* ¶ 12.

In the midst of Plaintiff's absences, Plaintiff's direct supervisor, Ed Harwick, obtained updates on Plaintiff's status through Campbell. [282] ¶¶ 13, 17; [292] ¶ 13. Harwick signed a Notice of Formal Investigation based upon GCOR Rule violations for November 26 and November 27, 2013 but did not provide them to Plaintiff. [282] ¶ 14; [292] ¶ 14. On December 2, Plaintiff received a letter from Regional Chief Engineer Justin Meyer advising him that his "seniority and employment with CP Rail have been terminated effective immediately per Rule 27(e) due to [his] absence without proper authority between Monday, November 25 and Monday, December 2, 2013." [251] ¶¶ 29, 39. In his declaration submitted in conjunction with Defendant's motion for summary judgment, Meyers attests he "made the decision" to issue the termination letter. [254] ¶ 3. Don Hegland, a manager who had never met or worked with Plaintiff, also read the letter to Plaintiff over the phone on December 2. [251] ¶¶ 25, 29. Harwick sat in the room with Hegland as he read the letter. [293] ¶ 17.

By letter dated December 5, 2013, Plaintiff requested a hearing pursuant to Rule 27(e). [251] ¶ 31. About two weeks later, on December 20, Defendant sent Plaintiff a "notice of investigation" advising him that a hearing would take place determining the facts and circumstances and placing responsibility, if any, in

6

connection with his alleged failure to report for duty on November 25 through December 2. *Id.* ¶ 32. A hearing pursuant to the BRS CBA took place on January 14, 2014. *Id.* ¶ 33. A review process then ensued, after which Meyer advised Plaintiff, via letter dated January 30, 2014, that dismissal was proper under Rule 27(e) of the BRS CBA and that Plaintiff would remain dismissed. *Id.* ¶ 43. Meyer attests in his declaration that the review process following Plaintiff's January 14 hearing entailed: an exchange of email communication between himself, John Cartlidge in labor relations, Harwick, and Robert Johnson, a vice president for Defendant, in which Cartlidge and Robert Johnson concurred with Meyers' decision to dismiss Plaintiff under Rule 27(e) of the BRS CBA. [254] ¶¶ 7, 11; *see also* [282] ¶ 24. Meyers asserts that, at the times he issued the December 2 letter terminating Plaintiff and the January 30 letter confirming Plaintiff's dismissal, he had no knowledge of any complaints Plaintiff made to Defendant regarding discrimination, harassment, or retaliation based upon race or another protected characteristic. [254] ¶ 13.

Plaintiff exercised his union rights and appealed his Rule 27(e) dismissal under the BRS CBA through his union on May 21, 2014; Defendant responded to the appeal on July 2, 2014. [251] ¶ 45. On June 26, 2018, a federal arbitration panel held upon review of the evidence "that there is sufficient evidence in the record to support the findings that the Claimant acted in violation of Rule 27(e) when he failed to come to work over eight days, November 25, 26, 27, 28, 29, 30, as well as December 1 and 2." *Id.* ¶ 46. The panel, however, also reduced Plaintiff's dismissal to a long-term, time-served suspension and granted Plaintiff's request for reinstatement; the time-

served suspension amounted to a nearly five-year disciplinary suspension with no back pay. *Id.* ¶ 47.

### D.   Plaintiff's Claims of Hostile Work Environment

Plaintiff asserts that his coworkers directed various remarks at him during the time he worked as an assistant signalman in North Dakota. [251] ¶ 54. He claims that in or about May to June 2013, he was caught working outside without rain gear, and when he returned to the crew room, his manager Harry Blaine said he looked "like a little brown wet turd." *Id.* Blaine's supervisor, Hank Janz, overheard the remark and told Blaine he was out of line and it was inappropriate. *Id.* ¶ 55. Johnson also claims that Blaine once asked Plaintiff if he needed "his little blue bonnet." *Id.* ¶ 56. According to Plaintiff, Blaine said this upon Plaintiff's return from a leave he took to address a medical matter, intending to insinuate he was soft because he had been on leave. *Id.* Plaintiff also claims an incident occurred around June or July 2013, during which Blaine approached him and another coworker and yelled at them, "you f-ing guys, you're lazy; get up and do some work." *Id.* ¶ 58. Plaintiff claims the crew was taking a drink break at the time. *Id.*

Plaintiff also claims that another manager, Jay LKU, once told a coworker, Hassan Martin, while working outside as a crew that "you guys look like little monkeys out there working." *Id.* ¶ 59; [282] ¶ 4. Plaintiff says that when asked about whom he was referring to as "monkey," Jay responded "you (Martin) and D.C. (Dalonno Johnson, the Plaintiff)." [282] ¶ 4. The parties disagree exactly when Jay made this comment but concur that it occurred sometime when Plaintiff was first

beginning to work as a signalman in Minnesota. [251] ¶ 60; [281] ¶ 60. When Martin told Jay not to refer to them as monkeys, Jay responded that he was kidding around. [251] ¶ 61. Plaintiff also claims that, on another occasion in Plaintiff's presence, Jay told a Mexican-American worker that Mexicans were a "disgrace to humanity." [282] ¶ 4. Plaintiff's grandmother is half-Mexican. *Id.* The parties agree that Jay did not direct the comment at Plaintiff. [251] ¶ 63.

The parties also agree that Jay serves in the capacity of crew foreman. [251] ¶ 64; [281] ¶ 64. According to Defendant, crew foreman constitutes a union position and Jay is a union employee. [251] ¶ 64. Plaintiff insists that this is a position of authority, and that Jay supervises and directs signal and construction employees. [281] ¶ 64.

Plaintiff maintains that he reported the alleged harassment to Hank Janz, a manager in North Dakota, and to his union representative, Kim Poole. [251] ¶ 67; [289] ¶ 10. According to Plaintiff, Defendant neither interviewed him about these incidents nor took any disciplinary action against Blaine or Jay. [282] ¶ 7.

Plaintiff has attempted to identify similarly situated comparators who he claims Defendant treated more favorably because they are white and he is black. Plaintiff identifies Richard Vock, a conductor, who Defendant dismissed on March 3, 2016. [282] ¶ 26. Defendant dismissed Vock for violations of Rules 1.29 and 1.6 of the GCOR and later reinstated him on October 10, 2017 via a last chance reinstatement agreement. [293] ¶ 26. Defendant dismissed another conductor, Will Copeland, in March or May of 2017, for violations of Sections 1.4 and 2.21 of GCOR.

[282] ¶ 27; [293] ¶ 27.  Defendant later reinstated Copeland via letter on April 12, 2018, without back pay.  [293] ¶ 27.

Sometime in 2018, Robert Kopca, a conductor, came to work and kidnapped a journeyman at gunpoint, holding him until he escaped. [282] ¶ 28. Defendant noticed Kopca for formal investigation under his applicable conductors' CBA.  *Id.*; [293] ¶ 28. Kopca resigned after Defendant issued the notice but before the investigation actually took place.  [293] ¶ 29.

In addition to the three conductors described above, Plaintiff also identifies as comparators employees working in Signal & Communications.  [282] ¶ 29.  One section foreman, William Schmidt, approached another co-worker, Kim Poole, and struck Poole with a shovel.  [293] ¶ 29.  Following the incident, Defendant noticed and held a hearing to investigate Schmidt's conduct and thereafter issued Schmidt a disciplinary suspension for various company rule violations.  *Id.*

Plaintiff has also identified Jeremy Hanson, a furloughed conductor who also accepted an assistant signalman position pursuant to the side letter and began working in such capacity in April 2013. [251] ¶ 69; [282] ¶ 30; [293] ¶ 30.  Hanson, however, did not make it through the probationary period for that position after he was issued a ticket for drinking while driving to the work.  [251] ¶ 70; [282] ¶ 30. Because he was still on probationary status as an assistant signalman, Defendant denied Hanson's application in June 2013 within the new hire ninety-day probationary period. [251] ¶ 70.  Instead of termination, Hanson returned to work on

furloughed conductor status; and later, he returned to conductor position from furlough status on October 22, 2013.  [293] ¶ 30.

### E.    Plaintiff's EEOC Charge and Lawsuits

Plaintiff filed a discrimination charge with the EEOC on September 29, 2014, alleging race and color discrimination in violation of Title VII.  [251] ¶ 48.  Plaintiff filed an amended charge on November 29, 2014 to include discrimination on the basis of sex and retaliation.  *Id.* ¶ 49.  By letter dated January 8, 2015, the EEOC advised Plaintiff it would forward the charge and associated documents to the North Dakota Department of Labor and Human Rights (NDDLHR) for review and processing of the charge.  *Id.* ¶ 49.  Ultimately, the NDDLHR concluded on May 26, 2016 that the "evidence demonstrates that all of the [Plaintiff's] allegations are beyond the 300-day statute of limitations and cannot be addressed."  *Id.* ¶ 50.  THE NDDLHR instructed Plaintiff that he had "ninety days from the date of the department issues a written notice to the complainant that administrative action on the complaint has been concluded" to bring suit in federal district court.  *Id.* ¶ 51.

Plaintiff filed an initial lawsuit *pro se* alleging Title VII claims on August 29, 2016; at the time, he had not yet received his EEOC dismissal and notice of rights from the EEOC.  [282] ¶ 31; [293] ¶ 31; *see Johnson v. Canadian Pac. R.R.*, No. 16-cv-8200 (N.D. Ill. Aug. 29, 2016), ECF No. 8.  On October 19, 2017, the district judge held a motion hearing on Defendant's pending motion to dismiss; when Plaintiff failed to appear, the judge dismissed the case without prejudice for lack of proper service, instructing Plaintiff that if he "wishes to pursue his claims further, he must file a

new case." *Johnson v. Canadian Pac. R.R.*, No. 16-cv-8200 (N.D. Ill. Oct. 19, 2017), ECF No. 18; *see also* [30] at 1.

On September 30, 2016, the EEOC issued a right-to-sue letter but rescinded it on October 5, 2016. [282] ¶ 32. The EEOC then reissued the right-to-sue letter on or around January 21, 2017. *Id.*; [293] ¶ 32. Plaintiff filed the complaint in this case over ten months later, on October 31, 2017. [1].

### D. Plaintiff's Claims in this Case

In his complaint, Plaintiff, then proceeding *pro se*, brought claims under Title VII and Section 1981 for color, national origin, and race discrimination, and for retaliation. [11]. Plaintiff claimed that Defendant subjected him to "seven months of ongoing racial discrimination and harassment within in [sic] a hostile work environment" which culminated in his wrongful termination. *Id.* at 5.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

12

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## III.  Analysis

Defendant moves for summary judgment on Plaintiff's claims, arguing that: (1) the Railway Labor Act (RLA) precludes Plaintiff's claims; (2) Plaintiff's Title VII claims are time-barred; (3) and even if not preempted or time-barred, Plaintiff's discrimination and retaliation claims fail as a matter of law. [250]. This Court will address the threshold issue of RLA preclusion first before turning to the remainder of the arguments.

### A.    RLA Preclusion[2]

### 1.    Minor Disputes Under the RLA

Congress enacted the RLA in 1926 out of a concern that the "nation's transportation network" might be "brought to a standstill because of labor conflict." *Bhd. of Locomotive Eng'rs & Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 755 (7th Cir. 2017). The RLA "is designed to substitute bargaining, mediation, and arbitration" for strikes, and thus, a "strong preference for arbitration, as opposed to judicial resolution of disputes," inheres in the RLA. *Id.*

The RLA provides a mandatory and exclusive arbitral mechanism for "minor" disputes between railroads and their employees. *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). "Minor" disputes are those "'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 831 (7th Cir. 2014) (quoting 45 U.S.C. § 153(i)); *see also Bhd. of Locomotive Eng'rs*, 879 F.3d at 756. Generally, where a claim requires interpretation of a CBA or can be "conclusively resolved" by interpreting the CBA, the court will determine it a "minor" dispute subject to mandatory arbitration. *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001). But the "mere need to consult a collective bargaining agreement"

---

[2] Although the parties refer to the concept of RLA "preemption," the proper term is "preclusion" because Plaintiff brings only federal claims. "Preclusion" means that a federal statute displaces a *federal* claim, whereas "preemption" means that a federal statute displaces a *state* claim. *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 661 (7th Cir. 2001).

does not give rise to preclusion, and thus, when a claim does not arise under a collective bargaining agreement, preclusion only applies where a claim's "resolution depends on the disputed meaning of or requires interpretation of contract terms." *Rabe*, 636 F.3d at 873.

The Seventh Circuit has yet to resolve whether the application of the RLA's mandatory arbitration provision divests courts of subject matter jurisdiction or results in a decision on the merits. *See Miller v. Sw. Airlines Co.*, 926 F.3d 898, 901 (7th Cir. 2019); *Carlson*, 758 F.3d at 831. But it makes no difference because "either a substantive or a jurisdictional label" ends the litigation between these parties "and forecloses its continuation in any other judicial forum." *Miller*, 926 F.3d at 901.

### 2. The RLA Does Not Preclude Plaintiff's Claims

Defendant argues that the RLA precludes Plaintiff's claims because Rule 27(e) of the BRS CBA expressly provides that an employee's seniority and employment may be terminated when absent without authority, and thus, "any qualm" Plaintiff has about his dismissal implicates the CBA and triggers RLA preclusion. [250] at 4–5.

The Seventh Circuit's decision in *Carlson* controls whether the RLA precludes Plaintiff's discrimination and retaliation claims. In *Carlson*, the plaintiff alleged that her employer rejected her request for a reinstatement in retaliation for engaging in protected activity. 758 F.3d at 833. Like Defendant here, the *Carlson* employer argued that the RLA precluded the plaintiff's Title VII claims simply because, in refusing to reinstate the plaintiff, it acted pursuant to a collective bargaining agreement which provided the employer the right to refuse reinstatement. *Id.* at 832. This argument failed to persuade the Seventh Circuit which explained that a "claim

15

is not barred simply because "the action challenged by the plaintiff is 'arguably justified' by the terms of the CBA." *Id.* (quoting *Brown*, 254 F.3d at 668). And in that case, the plaintiff's employment discrimination claims depended upon a pure "'factual inquiry into any retaliatory [or discriminatory] motive of the employer' rather than on an interpretation of the collective bargaining agreement." *Id.* (alteration in original) (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 266 (1994)). Accordingly, the Seventh Circuit held that the RLA did not preclude the plaintiff's claims. *Id.*

Here, as in *Carlson*, Plaintiff brings discrimination and retaliation claims under Title VII and Section 1981. Whether Defendant violated these statutes depends upon a factual inquiry into Defendant's motives for allegedly discriminating against and terminating Plaintiff. *See Carlson*, 758 F.3d at 833; *compare Brown*, 254 F.3d at 668 (finding that the RLA precluded the plaintiff's ADA claim because the claim "depends in one crucial respect upon interpretation of the" applicable CBA, and that interpretation "could conclusively resolve" the claim). To be sure, as Defendant points out, Rule 27(e) of the BRS CBA might have provided it a contractual basis to terminate Plaintiff because of his absences. But as the court of appeals underscored in *Carlson*, an employer cannot ensure preclusion simply by asserting CBA-based defenses. 758 F.3d at 833. Even if the CBA provided Defendant the right to terminate Plaintiff, Plaintiff's claims remain viable if, as he claims, Defendant terminated Plaintiff for discriminatory purposes, and *not* because he violated the CBA. *See id.* ("Even if Carlson did not have the qualifications specified in the

16

collective bargaining agreement, she would still have viable Title VII claims if, as she alleges, the same potentially disqualifying attributes have been overlooked for men or for others who have not complained about discrimination."). In other words, the CBA-based defense cannot trigger preclusion because Plaintiff could show that, even if the defense applied, Defendant applied the CBA in a discriminatory or retaliatory manner. *See, e.g.*, *Butler v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 17 C 7860, 2019 WL 4735397, at *5 (N.D. Ill. Sept. 27, 2019) (holding that RLA preclusion did not apply because, although the plaintiff claimed that a last chance condition was impermissible under a CBA, his claims ultimately depended upon the assertion that his employer enforced the last chance condition because of his race, disability, and engaging in a protected activity); *Martinez v. Am. Airlines*, No. 15 C 7144, 2017 WL 201363, at *4 (N.D. Ill. Jan. 18, 2017) ("The fact that [an employer's] alleged motive . . . stems from the collective bargaining agreement does not make Martinez's claim a minor dispute."), *aff'd sub nom. Martinez v. Am. Airlines, Inc.*, 715 F. App'x 568 (7th Cir. 2018).

For these reasons, this Court concludes that the RLA does not preclude Plaintiff's claims.

## B.     Title VII's Statute of Limitations

Defendant next moves for judgment on Plaintiff's Title VII claims as time-barred. Under Title VII, a plaintiff can only file suit in federal court once he or she receives a right-to-sue letter from the EEOC; after receipt of the letter, the plaintiff must file suit within ninety days. *King v. Ford Motor Co.*, 872 F.3d 833, 839 (7th Cir.

2017) (citing 42 U.S.C. § *See* § 2000(e)-5(f)(1)). Here, it is undisputed that Plaintiff received two right-to-sue letters from the EEOC: the first on September 30, 2016 (which the EEOC rescinded on October 5, 2016), and another on or around January 21, 2017. [282] ¶ 32; [293] ¶ 32. Plaintiff did not file this lawsuit until November 13, 2017, approximately eleven months after the later of these dates. [11]. Thus, his Title VII claims are plainly time-barred under the ninety-day rule. This is not the first time this Court has considered the timeliness issue. In its order on Defendant's motion to dismiss in this suit, the Court noted that the Title VII claims "appear[ed] to be untimely," although it declined to formally dismiss the Title VII claim because Plaintiff could proceed with his Section 1981 claim which Defendant did not challenge at that juncture. [30] at 3–4.

Hoping to overcome summary judgment on timeliness grounds, Plaintiff creatively argues that he actually cured the timeliness deficiency because he filed the January 2017 right-to-sue letter in his *earlier filed* case (16-cv-08200), on April 13, 2017, less than ninety days from the date of his receipt. [280] at 13. But Plaintiff's filing of the right-to-sue in his *earlier* case is irrelevant. When "a "federal civil action is dismissed without prejudice, the statute of limitations runs continuously." *Lee v. Cook County*, 635 F.3d 969, 971 (7th Cir. 2011); *see also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 518 (7th Cir. 2019). Practically, a suit "dismissed without prejudice is treated for statute of limitation purposes as if it had never been filed." *Moore v. Cook County*, No. 09 C 2992, 2010 WL 11713370, at *2 (N.D. Ill. June 10, 2010) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000)), *aff'd sub*

*nom. Lee*, 635 F.3d at 969. Because the district court dismissed Plaintiff's first lawsuit without prejudice in October 2017, *see Johnson v. Canadian Pac. R.R.*, No. 16-cv-8200 (N.D. Ill. Oct. 19, 2017), ECF No. 18, this Court must treat that first lawsuit—for statute of limitations purposes—as if it never existed. While the court is aware the Plaintiff was *pro se* at the time, it does not matter for statute of limitations purposes that he filed the January 2017 right-to-sue letter in his earlier case. Of course, by the time the statute of limitations ran on that right-to-sue letter (sometime in April 2017), Plaintiff was still litigating his first case. Accordingly, the district court's dismissal of that first case in October 2017 amounted to a dismissal with prejudice because, by then, it was already too late for Plaintiff to refile his Title VII claims.

Perhaps it is for that reason that Plaintiff invokes the doctrine of equitable tolling which extends the statute of limitations period in limited circumstances. *Lymon v. United Auto Workers Union, Loc. 2209*, 843 F. App'x 808, 809 (7th Cir. 2021). To avail himself of equitable tolling, Plaintiff must show that: (1) he has been pursuing his rights diligently; and (2) some "extraordinary circumstance" beyond his control prevented him from timely filing his claim. *Lee*, 635 F.3d at 972; *see Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 257 (2016) (noting that equitable tolling only applies where "the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control"). Even if he demonstrated diligence (first prong), however, Plaintiff cannot show that an extraordinary circumstance (second prong) stood in the way.

In *Lee*, the Seventh Circuit considered the question of equitable tolling in a case, like here, where a district court's dismissal of an original suit without prejudice due to misjoinder amounted to an effective dismissal with prejudice because "it was *already* too late" for the plaintiffs to refile separate individual lawsuits. 635 F.3d at 972. The court rejected the notion that the dismissal without prejudice constituted an extraordinary circumstance under the equitable tolling doctrine and reasoned that the plaintiffs could have preserved the claim by appealing the district court's dismissal. *Id.*

So too, here. Under *Lee,* the district court's dismissal of Plaintiff's first case without prejudice fails to constitute an extraordinary circumstance; the proper course for Plaintiff to preserve his Title VII claim would have been to appeal the dismissal of the first case. 635 F.3d at 972. In addition, the record lacks any indication that an extraordinary circumstance *outside of Plaintiff's control* existed to prevent his timely failing. *See Menominee Indian Tribe of Wis.*, 577 U.S. at 257 (emphasizing that equitable tolling requires circumstances beyond the plaintiff's control). To the contrary, the record indicates that the district court dismissed Plaintiff's first lawsuit when he failed to appear at a hearing and for his inability to complete proper service. *See* [30] at 1. These are not circumstances outside of Plaintiff's control; he could have maintained his first suit and his Title VII claim by showing up to court and by perfecting service. His failures to do so foreclose the application of the equitable tolling doctrine.

20

For these reasons, this Court grants summary judgment to Defendant on Plaintiff's time-barred Title VII claims.

## C. Racially-Motivated Termination

Moving to the merits of Plaintiff's Section 1981 claims, Plaintiff advances two theories of discrimination: first, that Defendant terminated him because of his race, and second, that Defendant subjected him to a hostile work environment. In this section, this Court will assess the former theory.

In evaluating the merits of this theory, this Court's singular question boils down to whether the plaintiff's race caused his termination. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (providing the legal framework under Title VII); *see Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015) (noting the "legal analysis for discrimination claims under Title VII and § 1981 is identical"). Plaintiff can proceed to prove his claim under two methods.

First, Plaintiff may use the framework developed by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case by showing that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki*, 988 F.3d at 957; *see also Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021). Once the plaintiff establishes a prima facie case, the burden then "shifts to the employer to offer a nondiscriminatory motive"; if the employer does this, "the

burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020), *reh'g denied* (July 31, 2020)).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit introduced an alternative to the *McDonnell Douglas* framework. Under *Ortiz*, the core question in any employment discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action" at issue. 834 F.3d 760, 765 (7th Cir. 2016). When using this approach, courts ask only "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765). The Seventh Circuit's decision in *Ortiz*, however, "did not alter '*McDonnell Douglas* or any other burden-shifting framework.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766).

Plaintiff proceeds under both the *Ortiz* and *McDonnell Douglas* frameworks. *See* [280] at 18 (citing *Ortiz*), 19 (referencing pretext), 23 (discussing similarly situated employees). No matter the approach used here, Plaintiff fails to raise a triable of fact as to whether Defendant's termination was discriminatory.

### 1. *McDonnell Douglas* Framework

Under *McDonnell Douglas*, Plaintiff's discrimination claim fails to overcome summary judgment for at least two reasons.

22

First, Plaintiff cannot establish a prima facie case of discrimination because he fails to identify a similarly situated employee who received favorable treatment. While similarly situated parties need not be identical in every conceivable way, they must be directly comparable to the plaintiff in "all material respects." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Factors considered here "most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692–93 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)). And, of course, a similarly situated employee cannot share a plaintiff's "race, sex, religion, or other protected status." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 656 (7th Cir. 2021).

Plaintiff claims that numerous white employees violated Defendant's conduct rules, but Defendant treated all of them more favorably than Plaintiff who Defendant terminated. [280] at 24. Plaintiff points to Richard Vock, Will Copeland, Brian Kopka as conductor comparators; according to Plaintiff, Defendants treated these employees better by, in the cases of Vock and Copeland, allowing them to reinstate after disciplinary action, and in the case of Kopka, allowing him to resign rather than be terminated. *Id.* at 24–25. As the undisputed facts show, however, Vock and

Copeland were conductors, not assistant signalmen. And Plaintiff has not introduced any evidence that Defendant held conductors and assistant signalmen to the same "performance standards." Instead, Plaintiff was disciplined under the BRS CBA, an agreement not binding on conductors like Vock and Copeland. Importantly, there is no evidence that Vock and Copeland faced discipline from the same supervisor as Plaintiff. *Gamble v. FCA US LLC*, 993 F.3d 534, 539 (7th Cir. 2021); *see Coleman v. Donahoe*, 667 F.3d 835, 848–49 (7th Cir. 2012) (noting that, to show that employees were held to same standards, the plaintiff must introduce evidence that employees "were subject to the same standards of conduct, violated the same rule, and were disciplined by the same supervisor"). In fact, the evidence indicates that conductors and assistant signalmen worked under different CBAs dictating different conditions and work expectations.[3] [251] ¶¶ 4–5, 9; *see e.g., Golston v. Ford Motor Co.*, No. 18-CV-02844, 2021 WL 4477859, at *5 (N.D. Ill. Sept. 30, 2021) (holding that the plaintiff did not demonstrate a prima facie case of discrimination in part because he could not show that his proposed comparators engaged in similar violations of a company's anti-harassment policy).

Kopka cannot serve as a comparator because he resigned. His conduct was serious, to be sure. But his decision to resign was his own. It is speculation for Johnson to assert that the Defendant gave Kopka "the chance to resign and go work

---

[3] The Court disagrees with Defendant that Rule 27(e) is a "self-executing forfeiture and termination provision". [250] at 7. Section 27(e) permits termination, but the Court does not find it self-executing. Further, Vock engaged in conduct affecting the safe and inefficient operation of trains and causing delays; Copeland's issue involved "carrying out rules and reporting violations." [280] at 24. Safe operations, causing delays and reporting violations are serious infractions. This might be a matter for the jury if these individuals had the same supervisors as Plaintiff.

at another company, instead of being terminated." [282] ¶ 28. The evidence shows only that Kopka resigned prior to his hearing, not that Defendant accommodated him by "allowing" him to resign. *See* [283] at 47.

Plaintiff also relies on two employees working in Signal & Communications (where he was working at the time of his termination) to serve as comparators under *McDonnell Douglas*: William Schmidt and Jeremy Hanson. Schmidt served a disciplinary suspension for striking a coworker with a shovel, and Defendant denied Hanson's application to work as a signalman because he received a ticket for driving under the influence to work. [282] ¶ 30; [293] ¶ 29. Again, these are worrisome transgressions—assault on a co-worker and driving to work intoxicated. Unlike Plaintiff, however, neither faced discipline under Section 27(e) of the BRS CBA for taking unauthorized absences. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019) (noting that an employee served as a poor comparator to the plaintiff because the comparator's alleged conduct (inappropriate physical conduct) was "quite different" from the plaintiff's performance issues (tardiness, subpar work product)). Nor is there any "evidence about who decided how to discipline the comparators." *Golston v. Ford Motor Co.*, No. 18-CV-02844, 2021 WL 4477859, at *5 (N.D. Ill. Sept. 30, 2021); *see de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (in evaluating similarities between the plaintiff and an alleged comparator, courts should consider whether they shared the same disciplining supervisor); *Fennell v. BNSF Ry. Co.*, No. 17-CV-03291, 2020 WL 7024306, at *7 (N.D. Ill. Nov. 30, 2020) ("It is significant that the comparators did not share the same disciplinary

25

decision-maker as Plaintiff."). Plaintiff asserts that, like him, Schmidt and Hanson reported up to Harwick. [282] ¶¶ 29, 30. Yet the evidence he submits—Harwick's LinkedIn profile—fails to support that assertion, as it says nothing about who Harwick supervised and/or had the authority to discipline at any point in time. *See* [289-17]. Moreover, as discussed below in relation to Plaintiff's retaliation claim, the evidence shows that Justin Meyer made the ultimate decision to terminate Plaintiff. *See also* [254]. There is no evidence that Meyer also served as the disciplining supervisor for either Schmidt or Hanson. No reasonable jury could find commonality for a meaningful comparison between Plaintiff and either Hanson or Schmidt on the basis of this record.

Plaintiff's discrimination theory also fails under *McDonnell Douglas* because Defendant has introduced a non-discriminatory reason for terminating Plaintiff—his absences—and Plaintiff has not demonstrated that Defendant's proffered reason served as mere pretext for racially-motivated animus. Pretext means "a lie, specifically a phony reason for some action." *Chatman*, 5 F.4th at 746 (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). The Seventh Circuit sets a "high evidentiary bar" for pretext. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 894 (7th Cir. 2016). Thus, Plaintiff must also show that Defendant's explanations serve as a pretext specifically "*for the prohibited animus*." *Chatman*, 5 F.4th at 747 (emphasis added) (quoting *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013)).

Plaintiff points to several factors which he contends demonstrates pretext. First, he argues that Defendant wrongfully construed Section 27(e) of the BRS in a way that allowed it to terminate Plaintiff by charging him with taking seven duty days off without authorization, when the correct interpretation would only have counted four days of absence, requiring a hearing prior to termination. [280] at 19. But pretext does not arise from error, faulty reasoning, or mistaken judgment on the part of the employer. *Bless v. Cook Cty. Sheriff's Off.*, 9 F.4th 565, 573 (7th Cir. 2021); *Barnes v. Bd. of Trustees of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020). Even if Defendant made a grave error in its interpretation of Section 27, that fact alone does not suggest that Defendant's termination process "was used to hide racial discrimination." *Barnes*, 946 F.3d at 390. Plaintiff has presented no evidence indicating that Defendant did not honestly believe that Plaintiff had violated Section 27(e).

Plaintiff next questions whether Defendant correctly applied Rule 27(e)'s clause "absent from duty, *without proper authority*" because he *did* contact Campbell who he believed served as such proper authority. *Id.* at 19–20, [252-3] at 11 (emphasis added). Defendant responds that it interpreted the clause properly because Plaintiff never received *any* authority: he never requested permission to be absent, and he admits that he stated he would be there on November 25, then November 26, and then December 3. [292] at 11. No matter whether Plaintiff or Defendant presents the correct interpretation of the Rule, the evidence does not demonstrate pretext. Again, pretext does not arise when an employer commits a

mistake or even acts unfairly; Defendant's reason for termination need not be correct, only honest. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 663 (7th Cir. 2016). There exists no evidence that Defendant gave a dishonest reason.

Plaintiff also urges this Court to infer pretext from Defendant's alleged failure to follow its own progressive discipline policy. [280] at 20. To be sure, unexplained or systematic deviations from established policies can sometimes raise an inference of discriminatory intent. *Smith*, 806 F.3d at 907. But no such policy was in place at the time Defendant terminated Plaintiff. Plaintiff cites a policy—a "Positive Behavior & Performance Development Policy"—that references the availability of informal coaching and counseling by a "supervisor" to remedy work-related issues before imposing more severe discipline. *See* [289-3] at 59–60. This policy, however, was discontinued by March 17, 2013, and thus, was not in effect by the time Defendant terminated Plaintiff in December 2013. *See* [277]; [278]; [294] ¶ 4. In a similar vein, Plaintiff insists that his supervisors—including Harwick and Hegland—should have simply coached him instead of terminating him, and suggests that Harwick could have offered Plaintiff the opportunity to work in Chicago instead of terminating him. [280] at 21–22. Again, however, Plaintiff points to no policy mandating Harwick or Hegland to engage in informal discipline with Plaintiff. Nor does Plaintiff point to any policy indicating that Harwick should have considered transfer rather than termination. No reasonable jury could infer discriminatory intent from these facts.

At most, viewing all facts in Plaintiff's favor, the evidence demonstrates that Defendant applied the CBA's termination provision against Plaintiff harshly or even incorrectly. Plaintiff's complaints amount only to "quibbles with the wisdom of his employer's decision." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016). This falls short of proving that Defendant's discriminatory animus motivated its decision to terminate Plaintiff.

### 2. *Ortiz* Framework

Plaintiff similarly fails to raise a genuine issue of material fact under the *Ortiz* framework because he lacks evidence that his race caused his discharge. Under *Ortiz*, "all evidence belongs in a single pile and must be evaluated as a whole," and this Court asks whether a reasonable juror could conclude that Plaintiff would have kept his job if he was a different race, and "everything else had remained the same." 834 F.3d at 766.

The evidence as a whole suggests that Defendant terminated Plaintiff due to his unexcused absences between November 25 and December 2, 2013, [251] ¶¶ 29, 39, and that the authority for Defendant to do so came from the BRS CBA governing Plaintiff's employment, which provides that the "seniority and employment of an employee who is absent from duty, without proper authority may be terminated." [252-3] at 11. As discussed below in the context of Plaintiff's hostile work environment theory, Plaintiff provides admissible evidence that he experienced racist remarks from other employees while he worked as an assistant signalman in North Dakota. But generally, "stray remarks" will "not support an inference of

29

discrimination unless the decisionmaker or someone with influence over the" adverse employment decision "made the comment around the time of, or about, the adverse action." *Seymour-Reed v. Forest Preserve Dist. of DuPage Cty.*, 752 F. App'x 331, 335 (7th Cir. 2018) (internal quotation omitted). There is no evidence that this is the case. And in any event, the "connection" between those remarks to his "layoff is nonexistent." *Alvares v. Bd. of Educ. of City of Chi.*, No. 18 CV 5201, 2021 WL 1853220, at *11 (N.D. Ill. May 10, 2021) (granting summary judgment to the defendant where the plaintiff presented some evidence of racial bias, but no evidence that the bias had any connection to his termination). Because Plaintiff has presented no evidence that Defendant terminated him on account of his race, Plaintiff's claim also fails under *Ortiz*.

### D. Hostile Work Environment Theory

Plaintiff also advances a theory that he experienced discrimination amounting to a hostile work environment prior to his transfer to Wisconsin. [292] at 14. A hostile work environment constitutes a form of discrimination under Section 1981. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018); *Dunn v. Chi. Transit Auth.*, No. 16-CV-08691, 2021 WL 4502165, at *7 (N.D. Ill. Sept. 30, 2021). To prove this claim, Plaintiff must show: (1) unwelcome harassment; (2) based upon his race; (3) that was "so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment"; and (4) a basis for employer liability. *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021); *see also Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021).

30

Defendant attacks Plaintiff's proof only on the third prong—severe or pervasive harassment. [250] at 10–12. Whether harassment meets this "severe or pervasive" bar depends upon the "severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)). Moreover, the standard is disjunctive; Plaintiff can meet it by showing a single extremely severe act of harassment, or alternatively, by a series of less severe acts. *Robinson v. Perales*, 894 F.3d at 828.

Plaintiff points to various incidents he contends demonstrates severity of harassment he experienced: (1) when Blaine, a manager for Defendant, said to Plaintiff "you look like a cold, wet little brown turd"; (2) when Blaine called Plaintiff and Hassan Martin, another black coworker, "lazy" when they were on breaks; and (3) when a crew foreman, Jay, told Martin and Dalonno "you guys look like little monkeys out there working"; (4) when Jay called Mexicans a "disgrace to humanity." Defendant maintains these "isolated, stray and disconnected" remarks do not rise to the level of "severe or pervasive harassment, [292] at 14, but that question "is generally a question of fact for the jury," *Johnson*, 892 F.3d at 901.

Indeed, this Court finds that these several comments raise a jury question as to whether Plaintiff experienced a severe or pervasive working environment. In the context of claims involving racial harassment, "racially-charged words certainly can

suffice" to raise a jury question as to whether a work environment was sufficiently severe or pervasive. *Passananti v. Cook County*, 689 F.3d 655, 668 (7th Cir. 2012); *see also, e.g.*, *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010) (holding that summary judgment was inappropriate as to the "severe or pervasive" prong where evidence showed that coworkers called the plaintiff "a black bitch" and the "n-word" on multiple occasions); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (noting that "unambiguously racial epithet falls on the 'more severe' end of the spectrum"). At least three of the alleged remarks clearly are racially-charged, and thus, lie at the severe end of the spectrum in the context of hostile work environment claims.

Defendant argues that Plaintiff lacks evidence that the alleged remarks unreasonably interfered with his work performance because his performance and attendance did not suffer immediately after the remarks occurred. [292] at 15. The Court disagrees. Plaintiff must demonstrate that the harassment "unreasonably interfered with" his "work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). Based upon the racially-charged content of at least three of the remarks, a reasonable juror could infer that the remarks were "unwelcome" and thus affected Plaintiff's psychological well-being. *Id.*

In addition, Plaintiff asserts that he complained to Hank Janz, a manager, and to his union representative, Kim Poole, about these incidents, but that Defendant

neither interviewed him about these incidents nor took any disciplinary actions against the coworkers who made the comments. [251] ¶ 67; [282] ¶ 7. Crediting Plaintiff's account, the fact that he took the step to complain to higher-ups also creates an inference that Plaintiff suffered psychologically from these remarks.

For these reasons, this Court denies summary judgment on Plaintiff's hostile work environment theory.

### E.     Retaliation Claim

This Court next considers Plaintiff's retaliation claim. To overcome summary judgment on this claim, Plaintiff must point to admissible evidence that: (1) he engaged in statutorily protected activity; (2) his employer took a materially adverse action against him; and (3) the adverse action was caused by the protected activity. *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 & n.2 (7th Cir. 2021). The parties dispute whether Plaintiff has offered sufficient evidence as to the first and third elements.

On the first element—whether Plaintiff engaged in statutorily protected activity—Plaintiff points to evidence that he raised concerns about harassment to a manager, Hank Janz, and to his union representative, Kim Poole. [251] ¶ 67. Defendant argues that this proof falls short because Plaintiff did not "make any complaints to CP pursuant to its policies," and moreover, his alleged reports to Poole lack any detail or specificity. [250] at 12. That Plaintiff did not make a "formal" complaint pursuant to Defendant's formal policies does not render his verbal complaints unprotected: Even an informal or verbal complaint may qualify as

protected activity. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011); *see also Smith v. Ill. Dep't of Transp.*, No. 15 C 2061, 2018 WL 3753439, at *7 (N.D. Ill. Aug. 8, 2018) (observing that "protective activity can be presented in various forms, including internal company complaints"), *aff'd*, 936 F.3d 554 (7th Cir. 2019).

But Defendant is correct that the evidence surrounding Plaintiff's complaints to Janz and Poole remains thin. Vague and obscure complaints do not constitute protected activity. *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). And merely complaining in general terms of harassment or discrimination, "without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016) (quoting *Orton-Bell v. Indiana*, 759 F.3d 768, 776 (7th Cir. 2014)). Nowhere in the record does Plaintiff specify what he said to Janz and Poole, when he did so, and whether he complained only about general harassment or whether he complained specifically that others harassed him due to his race or membership in another protected class. Without evidence that Plaintiff complained specifically about harassment in connection with his membership in a protected class, Plaintiff fails to prove the first element of his retaliation claim. *See, e.g., Hamzah v. Woodman's Food Mkt., Inc.*, No. 13-CV-491-WMC, 2016 WL 297748, at *7 (W.D. Wis. Jan. 22, 2016) ("By failing to make any reference to facts or to his protected status in his letters, from which one could detect even an implicit reference to discrimination on the basis of his race, ethnicity or age, there are no facts indicating that Hamzah

34

engaged in statutorily protected activity at any time before Martinson fired him.");
*Anderson v. Off. of Chief Judge of Cir. Ct. of Cook Cty., Ill.*, 66 F. Supp. 3d 1054, 1067
(N.D. Ill. 2014) ("Anderson complained to her employer about comments and
treatment by Jones that bothered her, but Anderson offers no evidence that any of
the complained-of conduct related to her race.").

Even if Plaintiff could meet his burden of proof on the first element of
participating in a statutorily protected activity, his proof remains deficient on the
third element of causation. Because Defendant does not admit to retaliation, Plaintiff
must rely upon circumstantial evidence like suspicious timing, ambiguous
statements, and treatment of similarly situated employees to demonstrate causation.
*Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 379 (7th Cir. 2020). Plaintiff
contends, as he did in opposing summary judgment on his discrimination claim, that
Defendant treated similarly situated employees better. [280] at 29. But this Court
explained above that the employees Plaintiff identified serve as poor comparators.

Plaintiff also suggests that suspicious timing raises an inference of causation.
[280] at 29. In the Seventh Circuit, suspicious timing is rarely enough to raise a
triable issue. *Igasaki*, 988 F.3d at 959. Thus, courts typically "allow no more than a
few days to elapse between the protected activity and the adverse action" to draw an
inference of causation on suspicious timing alone. *Id.* (quoting *Kidwell v. Eisenhauer*,
679 F.3d 957, 966 (7th Cir. 2012)); *see also FKFJ, Inc. v. Village of Worth*, 11 F.4th
574, 586 (7th Cir. 2021). Plaintiff's suspicious timing argument lacks factual support
because he does not point to any admissible evidence as to when he complained to

Poole and to Janz about the harassment. He asserts in his brief that he complained to Poole "most recently in mid-November 2013," but the statement of fact he cites fails to support that assertion. *Compare* [280] at 8 *with* [282] ¶ 7. Even assuming Plaintiff's latest complaint occurred in mid-November 2013, Defendant did not terminate him until December 2, 2013. Thus, more than "a few days" elapsed, undercutting an inference of causation based upon suspicious timing. *Igasaki*, 988 F.3d at 959. Further, Plaintiff's suspicious timing argument fails for another reason: there exists a significant intervening event separating his protected activity from his termination. *Kidwell*, 679 F.3d at 967. That is, it remains undisputed that Plaintiff did not report to work on scheduled days in late November and early December. These "intervening absences" "eliminate any retaliatory inference" based upon timing. *Hubbard v. M & K Truck Centers*, No. 18 C 8343, 2020 WL 7027607, at *9 (N.D. Ill. Nov. 30, 2020); *see also Young-Gibson v. Bd. of Educ. of City of Chi.*, 558 F. App'x 694, 699–700 (7th Cir. 2014) (holding that "significant intervening events" involving the plaintiff's insubordination and placement on probation foreclosed the plaintiff's suspicious timing argument).

Plaintiff also attempts to offer circumstantial evidence through "fishy" behavior on the part of Ed Harwick, the director of Signal & Communications and Plaintiff's direct supervisor when he served as an assistant signalman. Plaintiff claims that after he reported harassment to Poole, Poole "relayed" Plaintiff's concerns to Harwick in mid-November 2013. [280] at 8. Then, in the midst of Plaintiff's absences from work in late November and leading up to Plaintiff's termination on

December 2, Harwick persistently called Campbell (the crew foreman) to ask about the absences and prepared a Notice of Formal Investigation based upon Plaintiff's absences on November 26 and November 27. *Id.* at 8, 30. Plaintiff argues that, based upon these facts, a fact-finder could infer retaliatory motive from Harwick's knowledge of Plaintiff's complaints coupled with his involvement with Plaintiff's termination. *Id.* at 30.

Plaintiff's argument, however, suffers from several evidentiary and legal flaws. First, Plaintiff introduces no admissible evidence to demonstrate that Harwick actually received notice of Plaintiff's complaints of racial harassment from Poole. Plaintiff attests in a declaration that on approximately November 18, 2013, Poole left him a voicemail "confirming that he had reported my concerns to Edward Harwick." [289] ¶ 11. Plaintiff then attaches an "transcript" of this voicemail which states:

> Johnson v. Soo Line Railroad
> Kim Poole voicemail 612.247.5465 (11.18.13):
>
> Hey Dalonno – this is Kim, give me call when you get a chance alright? I just talked to Ed Harwick about moving closer east. Umm, he says he's been trying to do it by seniority, trying to look at it and let me know what person you think is senior to you that's been moved east. He said that he's trying to move people east, but umm, and you're on the list, but give me a call back alright? Talk to you later. Ooh and I did tell him also that you got concerns about working out there and that you don't want to be out there anymore. ok? Talk to you later.

[289-4] at 2. This "transcript" is not certified and Plaintiff has not provided any information as to who transcribed the voicemail. Moreover, Plaintiff does not submit as evidence the alleged voicemail recording, nor any other details about the voicemail recording. *See, e.g.*, *Hochroth v. Ally Bank*, 461 F. Supp. 3d 986, 999 (D. Haw. 2020)

(noting that to lay a foundation to introduce tape recordings, the proponent of the evidence must provide verification of the date, information about whether he was competent to operate the recording device, and whether any change, additions or deletions were made to the recording). These issues raise insurmountable authenticity concerns under Federal Rule of Evidence 901. Simply put, this Court is not persuaded that the "transcript" is what Plaintiff claims it is.

Even if this Court considered the transcript, that piece of evidence remains insufficient to raise a triable issue regarding retaliatory motive. At most, the transcript shows that Poole related to Harwick Plaintiff's "concerns about working out" in North Dakota. Poole does not say that the "concerns" he related to Harwick had anything to do with the racial harassment Plaintiff experienced in North Dakota.[4] Thus, even if Harwick was the person who decided to terminate Plaintiff (and there is evidence that he was not, as discussed below), the record lacks evidence that he knew that Plaintiff's concerns related to *protected conduct*. *Miller*, 20 F.4th at 1156. Nor could a reasonable juror infer retaliatory intent from the fact that Harwick checked in consistently with crew foreman Campbell about Plaintiff's absences. Harwick served as Plaintiff's supervisor, so one would expect him to inquire about his employee's absences.

The record further reflects that it was not Harwick, but rather Regional Chief Engineer for Defendant, Justin Meyer, who made the decision to terminate Plaintiff. [254] ¶¶ 3. Meyer states he "made the decision" to issue the December 2, 2013

---

[4] The Court notes Plaintiff was transferred, consistent with his request, further East to Wisconsin shortly after this call.

termination letter, and that he also issued the January 30, 2014 letter confirming dismissal after consulting with other employees—including Cartlidge, Harwick, and Robert Johnson—and receiving concurrence from Johnson and Cartlidge. *Id.* ¶¶ 7, 11. Plaintiff has offered no evidence that Meyer knew that he had made internal complaints about the racist remarks he experienced in North Dakota. In fact, Meyer submits an unrebutted declaration stating he did not know that Plaintiff made any such complaints as of the time he made the decisions to issue the December 2 and January 20 letters terminating Plaintiff. *Id.* ¶ 13. That Meyer had no knowledge of Plaintiff's complaints also destroys the causal chain on a retaliation claim. *Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 513 (7th Cir. 2021) (affirming summary judgment on a retaliation claim where the plaintiff failed to introduce evidence that the decision-makers knew that the plaintiff made complaints based upon sex discrimination); *Evans v. United Parcel Serv., Inc.*, No. 19 C 4818, 2022 WL 212346, at *7 (N.D. Ill. Jan. 21, 2022) (granting summary judgment on retaliation claim where the record reflected no evidence "that the alleged retaliators knew of the charges until plaintiff filed the instant lawsuit").

Finally, by relying upon Harwick's purported involvement in the termination, Plaintiff ostensibly invokes a "cat's paw" theory of retaliation. *See* [280] at 30 (arguing that Harwick's animus should be imputed to Defendant due to Harwick's involvement in the multi-level review involving Plaintiff's termination). The cat's paw theory applies "when a biased supervisor who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory

employment action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021) (internal quotation marks omitted), *cert. denied*, 142 S. Ct. 401 (2021). To prevail on a cat's paw theory, Plaintiff must show both that Harwick "actually harbored discriminatory animus against him" and that Harwick's input proximately caused his termination. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019). Plaintiff offers no evidence that Harwick harbored any discriminatory animus against Plaintiff, nor that Harwick's input proximately caused Plaintiff's termination. Proximate causation does not lie where the employer possessed "independently sufficient reasons" to "take the adverse action." *Vesey*, 999 F.3d at 462. Although the parties agree that Harwick had some level of input in the review process following Plaintiff's termination, [254] ¶ 6, mere reliance by ultimate decisionmakers upon Harwick's input does not give rise to liability based upon a cat's paw theory, *McDaniel*, 940 F.3d at 370. As Meyer attests, *he* made the decisions to issue Plaintiff's termination letter after discussing Plaintiff's absences with Harwick, Cartlidge, and Robert Johnson; and then only after receiving concurrence from Robert Johnson and Cartlidge that the BRS CBA's Rule 27(e) applied to trigger Plaintiff's termination. *See* [254]. There is no evidence Meyer relied wholly upon Harwick's input, and thus, Defendant has demonstrated independently sufficient reasons to take adverse action.

For all of the above reasons, this Court grants summary judgment to Defendant on Plaintiff's retaliation claim.

**IV.     Conclusion**

For the reasons explained above, this Court grants in part and denies in part Defendant's motion for summary judgment [249]. The only claim standing is Plaintiff's Section 1981 claim based upon a hostile work environment; the other claims fail as a matter of law.

E N T E R:

Dated: February 23, 2022

_____
MARY M. ROWLAND
United States District Judge